**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00040-CV**
_____

**IN THE INTEREST OF C.W.S. AND J.S.**

_____

**On Appeal from the County Court at Law**
**Orange County, Texas**
**Trial Cause No. C200272-D**

_____

**MEMORANDUM OPINION**

Mother and Father appeal from an order terminating their parental rights.[1]

The trial court found, by clear and convincing evidence, that statutory grounds exist

for termination of Mother's parental rights to her minor children, C.W.S. and J.S.,

and that termination of Mother's parental rights would be in the best interest of

C.W.S. and J.S. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2);

161.003(a). The trial court found, by clear and convincing evidence, that statutory

---

[1]We refer to the appellants as "Mother" and "Father" and their children by their initials to protect their identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

1

grounds exist for termination of Father's parental rights to his minor children, C.W.S. and J.S., and that termination of Father's parental rights would be in the best interest of C.W.S. *See id.* § 161.001(b)(1)(D), (E), (O), (2). We affirm the trial court's judgment terminating Mother's and Father's parental rights.

MOTHER'S APPEAL

Mother's appointed counsel submitted a brief in which counsel contends that there are no arguable grounds to be advanced on appeal. *See Anders v. California*, 386 U.S. 738 (1967); *In the Interest of L.D.T.*, 161 S.W.3d 728, 731 (Tex. App.—Beaumont 2005, no pet.). The brief provides counsel's professional evaluation of the record. Counsel served Mother with a copy of the *Anders* brief filed on her behalf. This Court notified Mother of her right to file a *pro se* response, as well as the deadline for doing so. This Court did not receive a *pro se* response from Mother.

We have independently reviewed the appellate record and counsel's brief, and we agree that any appeal would be frivolous. We find no arguable error requiring us to order appointment of new counsel to re-brief Mother's appeal. *Cf. Stafford v. State,* 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). We affirm the trial court's judgment terminating Mother's parental rights to C.W.S. and J.S.

We deny the motion to withdraw filed by Mother's court-appointed counsel because an attorney's duty extends thought the exhaustion or waiver of all appeals. *See* Tex. Fam. Code Ann. § 107.016(2)(B); *In re P.M.*, 520 S.W.3d 24, 27 (Tex.

2

2016). Should Mother decide to pursue an appeal to the Supreme Court of Texas, counsel's obligations to Mother can be met "by filing a petition for review that satisfies the standards for an Anders brief." *See In re P.M.*, 520 S.W.3d at 27-28.

## FATHER'S APPEAL

## PERTINENT EVIDENCE

The Department received a referral alleging neglectful supervision and physical neglect of C.W.S. by Mother, who had dropped C.W.S. on repeated occasions and left C.W.S. in the bathtub alone. The referral alleged Mother allowed C.W.S. to be in contact with Mother's uncle, who was a registered sex offender, and her stepfather, who had allegedly sexually abused Mother. In the affidavit in support of removal, Lana Murphy reported that the family had two previous cases with the Department concerning mental health, substance abuse and an unsanitary living environment. Murphy averred that Mother suffers from Cerebral Palsy, ADHD and schizophrenia, and Mother tested positive on a hair test for Cocaine, Benzoylecgonine and Cocaine Metabolite. Murphy reported that Father was on probation for possession of a controlled substance, and Mother and Father had a history of domestic violence including multiple instances of strangulation offenses. Based on Murphy's affidavit reporting the family's history with the Department, the presence of escalating domestic violence, parental immaturity, and family

3

instability, the Department was named temporary sole managing conservator of C.W.S.

The record shows that shortly after J.S.'s birth, the Department was named temporary managing conservator of J.S. after receiving a report of neglectful supervision by Mother, who tested positive for cocaine while pregnant with J.S. In Angela Wilson's affidavit in support of removal of J.S., Wilson explained that Mother and Father failed to comply with a court order requiring J.S. to be drug tested at birth, and there were concerns regarding the parents' ability to care for J.S. Wilson explained the parents had been previously validated for physical neglect of C.W.S., who had been diagnosed with failure to thrive due to lack of sufficient nutrients. Wilson averred that Mother's cocaine use was still a concern, the parents do not appear to understand J.S.'s nutritional needs and they had not demonstrated the ability to provide a safe environment for J.S.

The Department filed petitions seeking the termination of Mother's and Father's parental rights to their minor children, C.W.S. and J.S. The trial court conducted a bench trial on the Department's petition. Wilson, a Department investigator, testified that J.S. was removed from her parents the week after her birth. Wilson testified that the Department received a referral concerning Mother's drug usage and positive drug screen during pregnancy, which occurred while Mother and Father were involved in another conservatorship case and resulted in the parents

4

being court ordered to test J.S.'s meconium at birth. Wilson explained that the parents did not notify the Department about J.S.'s birth or ask the hospital to test J.S.'s meconium. When Wilson visited with the parents and J.S. at their travel trailer, she discovered that they were not feeding J.S. an appropriate amount of formula, but the parents did not seem concerned. Wilson testified that when C.W.S. was removed from the parents due to concerns about domestic violence and drug usage, C.W.S. was diagnosed with failure to thrive due to a lack of nutrients.

Wilson also explained that during a Zoom hearing, she observed Mother holding J.S. without supporting J.S.'s head, and the trial court had to instruct Mother to support J.S.'s head. Wilson testified that the day of J.S.'s removal, a doctor advised the parents to take J.S. to the hospital, but they failed to do so. According to Wilson, the parents had not demonstrated the ability to independently care for J.S., and she was concerned about the parents' ability to meet J.S.'s medical needs. Wilson testified that the parents had three prior referrals in 2018, 2019 and 2020, and the 2018 referral concerned drug use and the physical neglect of Mother's oldest child. Wilson further testified that the 2019 referral concerned neglectful supervision due to Mother's untreated mental health, but the concerns were ruled out and C.W.S. was not removed.

Tiffany Noack, the children's foster parent, testified that she has had C.W.S. for twenty months and J.S. for fourteen months. Noack testified that when C.W.S.

came into her care he was very small, malnourished, developmentally delayed, and he was diagnosed with failure to thrive and 13Q interstitial deletion syndrome. Noack explained that C.W.S. has delayed speech and goes to speech therapy weekly, and he also has cognitive and motor skill issues, hearing loss and significant visual impairment. According to Noack, C.W.S. is progressing but is expected to have a lower-than-average IQ, and the 13Q interstitial deletion syndrome is a lifelong condition that requires a lot of testing and monitoring because it can cause future problems. Noack testified that C.W.S. may be unable to independently care for himself as an adult.

Noack explained that she was concerned that C.W.S.'s parents disagree with his diagnosis and believe that the Department made it up to prevent them from getting custody back, because his parents would not think it was necessary to continue care for his medical issues. Noack explained that the parents have indicated that they will move to Louisiana when the case is concluded because the Department has a vendetta against them. Noack testified that J.S. does not have any medical or mental health issues, but the day after J.S. was placed in her care, J.S. was hospitalized for three days for failure to thrive. Noack testified that if the court terminates parental rights, she intends to adopt the children, and it is not in the children's best interest to be in the parents' home.

Dr. Nisha Amin, a licensed psychiatrist, testified that the Department contracted with her to conduct psychological evaluations of the parents. Amin explained Mother reported that she tested positive for cocaine and that this was her fourth Department intervention. Amin explained that Mother also reported that her relationship with Father was "rocky" and included a history of drug use. According to Amin, Mother did not work or have her own transportation, and she denied that her child had any medical problems. Regarding Mother's mental assessment, Amin testified that Mother reported experiencing auditory and visual hallucinations, which indicated she was having ongoing issues with her schizophrenia.

Amin explained that due to Mother's mild mental retardation and second-grade level in academic functioning, it will be hard for Mother to care for herself, and Mother will have to rely on someone's supervision to help her raise her children. Amin further testified that since Mother reported sexual and physical abuse as a child, it would be difficult for Mother to rely on her parents for support, and Amin was concerned about Mother exposing her own child to the same environment. Amin explained that Mother's personality patterns include difficulty socializing, odd patterns of reality testing, anxiety, angry outbursts, passive aggressiveness, lack of organization, paranoia and delusions, and those patterns distort reality, make it hard for Mother to meet the needs of her children, who could be traumatized and at risk for mental health problems.

Amin diagnosed Mother with schizophrenia bipolar type, generalized anxiety disorder and borderline personality disorder. Amin explained that Mother's intellectual and mental health issues contributed to her denial that her child has serious medical issues. Amin testified that Mother needs psychiatric aid, including medications, which Mother has failed to consistently take, and Mother used drugs like marijuana to treat her symptoms. Amin explained that Mother needs ongoing help and supervision for herself before she can competently care for a child, which she has never independently been able to do.

Concerning his evaluation of Father, Amin explained that Father reported Mother to the Department because C.W.S. was in an unstable home with Mother, who was pregnant. According to Amin, Father could not identify that C.W.S. had any development delay, which the Department obviously reported. Amin testified that Father reported that he stopped taking drugs in March 2018 when he was charged with possession of a controlled substance and stopped drinking alcohol six months ago. Amin explained that Father has a low average range of intelligence, academically functions at a seventh-grade level and has a mild mental disorder. Amin diagnosed Father with ADHD and adjustment disorder with depressed mood. Amin opined that counseling and parenting education was vital for Father to have the capacity to care for C.W.S.'s needs. According to Amin, in a situation where both parents have mental health issues, the parents' mental health needs can override

8

their ability to care for a child. Amin testified that reunification was possible if Father could meet and sustain the Department's directives, as well as financial independence and sobriety. On cross-examination, Amin explained that to be able to effectively care for her children, Mother would have to seek mental health treatment, take medication, have a very good support system and be supervised daily. According to Amin, Father would also need a support system to raise the children.

Georgia Williams, a licensed professional counselor, testified that she counseled Mother and Father. Williams testified that the parents told her that the Department became involved after they got in a fight over the phone and Mother took C.W.S. to her mother's home. Williams explained that the parents reported Father called the Department because Mother had C.W.S. in a home with her brother, a registered sex offender, and her stepfather, who Mother claimed had sexually abused her. Williams testified that Mother reported that she tested positive for cocaine while pregnant, and the Department removed C.W.S. and the baby upon birth. Williams also testified that Father reported that Mother could not read and had gotten the numbers mixed up on the bottles, and he had to quit his job to help Mother and depended on his family for financial support. According to Williams, Mother reported that she was not taking her medications because Father said it makes her a zombie.

Williams explained that during her visits with Mother and Father, the parents reported they had completed some parenting and drug classes and that they were working with the Department to get their children back. Williams testified that the parents planned to move to Louisiana where they had family support to care for the children, but they felt like the Department had a grudge against them. Williams explained that during their visits, the parents never acknowledged any deficits in their parenting or that they had learned anything from the classes the Department was requiring them to take. Williams also explained that the parents did not appear to benefit from the counseling sessions, and she discharged them due to a lack of progress.

Williams testified that she did not recommend placing the children back with the parents because Mother was unable to care for the children without constant supervision, and Father could not provide the amount of required supervision while trying to work. Williams further testified that Father was co-dependent on Mother, and it was difficult to isolate whether he could care for the children. According to Williams, the parents were unable to demonstrate progress in providing a stable home for their children.

Randi Frazee, a Department caseworker, testified that during her brief involvement with the case, the parents were being moderate in their compliance with the Department's Service Plan. According to Frazee, although the parents had

completed some of their services, they had not demonstrated behavior changes. Frazee testified that she visited the parent's home on three occasions, and the home had roaches and bed bugs and no hot water at times. Frazee also explained that she had concerns that Mother was not taking her medications and that the parents were unable to provide the necessary paperwork to maintain their food stamps.

Lana Murphy, a Department investigator, testified that she investigated a report regarding concerns that Mother had C.W.S. in an unsanitary home and of possible sexual abuse. Murphy testified that she investigated Mother's parents' home, which was cluttered and had an abandoned, partially filled pool. Murphy explained that Mother reported that she was in a domestic violence relationship with Father and planned to get a divorce, and Mother made a police report alleging that Father had choked her on several occasions and wanted her to drown C.W.S. Murphy testified Mother was pregnant and tested positive for cocaine and C.W.S. also tested positive for cocaine. Murphy also testified that Mother's brother, who stayed at the home, had prior sexual abuse allegations, but Mother claimed her brother had no contact with C.W.S. Murphy explained that due to Department involvement, Mother did not have custody of her two other children, and Mother had a history of drug use, unsanitary living conditions and unstable mental health.

Murphy also explained that Father was concerned about C.W.S. due to the conditions of Mother's parents' home and the possible caregivers. Murphy testified

11

that Father reported being on probation for a possession charge, and he denied all claims of domestic violence, but other people confirmed that Father was abusive, including his mother. Murphy explained that Mother eventually dropped the charges against Father and moved back in with him. Murphy testified that she believed C.W.S.'s physical or emotional wellbeing was in danger and that Mother had knowingly placed or allowed C.W.S. to remain in conditions or surroundings which endangered his physical or emotional wellbeing. Murphy also testified that by testing positive for cocaine during her pregnancy, Mother abused her unborn child, and the fact that C.W.S. tested positive for cocaine shows that Mother exposed C.W.S. to conditions which endangered his physical or emotional wellbeing. Murphy further testified that the allegations that Father committed domestic violence raised concerns that Father exposed C.W.S. to an unreasonable risk of physical or emotional wellbeing.

Beth Green, a Department caseworker, testified that she was the main caseworker for C.W.S. and J.S. Green testified that Mother and Father indicated they understood the tasks and goal of their Family Service Plans. Green explained that Mother failed to comply with her Family Service Plan by failing to maintain suitable and appropriate housing, attend prenatal appointments, demonstrate that she learned an adequate amount of skills from the parenting course to alleviate the Department's concerns, maintain an appropriate support system, comply with the

recommendations from her psychological and psychiatric evaluations, and manage her medication. Green testified that Mother had positive hair follicle tests in May 2020 during the investigation of C.W.S. and in September 2020 after completing an outpatient drug assessment, and the Department determined that the second test demonstrated new use and requested Mother complete a new drug assessment. According to Green, Mother has had negative drug tests since September 2020.

Green also explained that Father failed to comply with his Family Service Plan by failing to maintain financial stability and stable housing, demonstrate that the usage of the skills learned in the parenting course, and attend counseling and demonstrate the ability to address the issues that led to C.W.S.'s removal. Green testified that the parents were living together before C.W.S. and J.S. were removed and diagnosed with failure to thrive and that Father was dismissive of C.W.S.'s medical conditions. Green further testified that Father failed to demonstrate he could care for the children and be the protective parent and adequately supervise Mother and was dismissive of Mother taking her medications.

According to Green, Mother and Father knowingly placed or allowed C.W.S. and J.S. to remain in conditions and surroundings that endangered their physical and emotional wellbeing, and both parents engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional wellbeing of the children. Green testified that she believes the parents

13

have a mental or emotional illness or mental deficiency that renders them unable to provide for the physical and emotional needs of their children until the children are eighteen years old. Green further testified that it was in the best interest of the children that Mother's and Father's parental rights be terminated so the children could be adopted and C.W.S. could continue to get the medical care he needs.

Mother testified that she understood the Department removed C.W.S. because she alleged that Father hurt her and because she and C.W.S. had drugs in their system. Mother testified that she went over her Family Service Plan with the Department and worked on her plan. Mother explained that she receives disability because she has cerebral palsy and Hirschsprung's disease, but when C.W.S. was removed she was not getting disability because Father made too much money. Mother testified that she could care for the children because she is receiving disability and food stamps and financial support from Father's parents. Mother also explained that she was concerned about C.W.S.'s weight because he did not want to eat, but she did not notice anything else of concern. Mother testified she tried to notify the Department about J.S.'s birth, and she asked the hospital about testing J.S.'s meconium.

According to Mother, she provided stable housing, successfully completed counseling, and is no longer arguing with Father. Mother explained that if the children were returned, she planned to put them in daycare and move to Louisiana

14

to have the support of Father's family. Mother also explained that she is currently taking her medications and plans to continue to do so with Father's support, and she has demonstrated that she can stay drug free. Mother testified that it was not in the children's best interest to terminate her parental rights. Mother explained that she has two sons who live with their fathers, and the Department was involved with one of her sons due to her use of cocaine.

Father testified that he called the Department about C.W.S. because he felt that C.W.S. was in danger being at Mother's parents' home. Father explained that Mother's brother was a sex offender and her stepfather had molested her. Father denied any claims of domestic violence, which Mother recanted. Father also testified that he did not know how Mother tested positive for drugs because they had quit using drugs after he got arrested for possession of drugs and unlawfully carrying a weapon and was placed on probation for possession of a controlled substance. According to Father, Mother had problems with drugs when C.W.S. was born. Father explained that he did not think they underfed C.W.S. and that C.W.S. was fine. Father also explained that he was aware of C.W.S.'s condition and needs, but he wanted to get another doctor's opinion. According to Father, he planned to return to work, send C.W.S. to daycare, and take C.W.S. to his doctor appointments.

Regarding J.S., Father testified that he stayed home during the short time they had her, and they did not underfeed J.S., and she was progressing like C.W.S. had

15

done. Father explained that they fed J.S. every three to four hours and when she cried, but J.S. had a problem with spitting up frequently. Father also explained they had plenty of formula for J.S., and his mother, stepfather, and a friend provided them with support. According to Father, he maintained stable housing and did what he needed to financially support the household, and he intends to return to work. Father testified that he needs to fix the hot water, but it is not a big deal because he has access to hot water at the trailer park's shower house. Father also testified that he still has a roach problem.

Father explained that he intends to move to Louisiana where he has family and find or build a house. According to Father, he completed two parenting courses and learned how to take care of the children and run a household. Father testified that he also went to two counselors, Williams and Manning, and Manning helped him deal with getting through his depression about this situation. Regarding Mother's mental health, Father explained that she is a slow learner and has "freak out moments" when she gets stressed, and he helps her calm down. Father also explained that he encourages Mother to take her medication and encourages her to get her medication adjusted at times. Father testified that he intends to remain married to Mother, take care of the children, and never leave the children unsupervised with Mother. Father further testified that he thinks Mother was a great mom before the Department became involved.

Dorothy Stanley, the guardian ad litem for the children, testified that the parents were both caring for C.W.S. when he was failing to thrive, and the feeding issue came up again when J.S. was removed. Stanley testified that Mother and Father knowingly placed or allowed the child to remain in conditions or surroundings which endangered their physical or emotional wellbeing. Stanley explained that Father allowed Mother to care for and improperly feed the baby, which caused weight loss and failure to thrive. Stanley also testified that Mother and Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional wellbeing of the children. According to Stanley, Father left Mother in charge of the children knowing that she is not capable of caring for a young child. According to Stanley, Father had isolated Mother, called the shots, allowed Mother to primarily care for the children, and endangered the children by not intervening and seeing to their proper care. Stanley testified that it was in the best interest of the children to terminate Mother's and Father's parental rights because the children will not be safe with the parents, who are not equipped to raise the children. Brennon Mitchell, the attorney ad litem for the children, advised the court that although he believed that it may be in the children's best interest to terminate Father's parental rights, he did not recommend termination because he did not know if there was clear and convincing evidence supporting a predicate statutory ground for termination of Father's parental rights.

17

The trial court found that clear and convincing evidence supported three predicate statutory grounds for terminating Mother's and Father's parental rights and that termination of Mother's and Father's parental rights was in the best interest of C.W.S. and J.S. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). The trial court also found by clear and convincing evidence that Mother has a mental or emotional illness or a mental deficiency that renders her unable to provide for the children's needs until their eighteenth birthday. The trial court appointed the Department as the permanent managing conservator of C.W.S. and J.S.

ANALYSIS

In four issues, Father challenges the legal and factual sufficiency of the evidence supporting the best-interest finding and the termination grounds specified in sections 161.001(b)(1)(D), (E) and (O). *See id.*

Under legal sufficiency review, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

18

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id*. We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its ruling. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

The decision to terminate parental rights must be supported by clear and convincing evidence, *i.e.*, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *see also In the Interest of J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best-interest finding is also supported by legally and factually sufficient evidence. *In the Interest of C.A.C., Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont

19

May 5, 2011, no pet.) (mem. op.). However, when, as here, a parent challenges a trial court's findings under section 161.001(b)(1)(D) or (E), we must review the sufficiency of those grounds as a matter of due process and due course of law. *See In the Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

Section 161.001(b)(1)(D) of the Family Code allows for termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In the Interest of J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citations omitted). A parent's conduct in the home can create an environment that endangers the child's physical and emotional well-being. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *In the*

20

*Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (citations omitted).

For purposes of subsection (E), endangerment means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *In the Interest of M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.). Termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent. *Interest of M.L.L.*, 573 S.W.3d at 363-64. A parent's conduct that subjects a child's life to instability and uncertainty endangers the emotional or physical well-being of a child. *Id.* at 363. Endangerment is not limited to actions directed toward the child and includes the parent's actions before the child's birth and while the parent had custody of older children, including evidence of drug usage. *In the Interest of J.O.A.*, 283 S.W.3d at 345. Courts may consider whether a parent's drug use continues after the child is removed from the parent's care, as such conduct shows a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *In the Interest of J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see In the Interest of M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

The trial court heard that Mother had a history with the Department concerning drug use, unsanitary living conditions, and unstable mental health and

that Mother did not have custody of her two other children. The trial court heard evidence that Mother and Father were involved in a conservatorship case involving C.W.S. when C.W.S. and Mother, who was pregnant with J.S., tested positive for cocaine, and J.S. was removed the week after her birth. The trial court heard testimony that Mother abused J.S. by testing positive for cocaine during her pregnancy, and that C.W.S.'s positive test for cocaine shows that Mother exposed C.W.S. to conditions which endangered his physical or emotional wellbeing.

The trial court also heard that when C.W.S. was removed from the parents due to concerns about domestic violence and drug usage, C.W.S. was diagnosed with failure to thrive due to a lack of nutrients, and Wilson also discovered that the parents were not feeding J.S. an appropriate amount of formula. The trial court considered testimony that the parents had not demonstrated the ability to independently care for J.S. and to meet J.S.'s medical needs. The trial court heard testimony that after J.S. was removed, she was hospitalized for three days for failure to thrive.

The trial court heard Green testify that the parents were living together before the children were removed and diagnosed with failure to thrive, that Father was dismissive of C.W.S.'s medical conditions, and that Father failed to demonstrate he could care for the children and be the protective parent and adequately supervise Mother. The trial court considered Green's testimony that Father knowingly placed or allowed the children to remain in conditions and surroundings that endangered

22

their physical and emotional wellbeing and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional wellbeing of the children, and that Father had failed to demonstrate that he had the skills and ability to address the issues that led to C.W.S.'s removal.

The trial court also considered Stanley's testimony that the parents were both caring for C.W.S. when he was failing to thrive and when the feeding issue came up again when J.S. was removed. The trial court heard that Father knowingly placed or allowed the child to remain in conditions or surroundings which endangered their physical or emotional wellbeing by allowing Mother to care for and improperly feed the baby, which caused weight loss and failure to thrive. The trial court also heard that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional wellbeing of the children by leaving Mother in charge of the children knowing that she is not capable of caring for a young child. The trial court further considered Stanley's testimony that Father endangered the children by allowing Mother to be the primary caregiver of the children and not intervening and seeing to their proper care.

The trial court heard Williams testify that the parents never acknowledged any deficits in their parenting or showed that they had learned anything from the classes they took, and that the parents did benefit from counseling. The trial court also considered Father's testimony that Mother had problems with drugs when C.W.S.

23

was born and that he did not know how Mother tested positive for drugs because they had quit using drugs. The trial court also heard Father testify that before the Department intervened, the children were fine and progressing and that Mother was a great mom.

Viewing the evidence in the light most favorable to the trial judge's findings, we conclude that the trial judge could reasonably have formed a firm belief or conviction that Father knowingly placed or knowingly allowed C.W.S. and J.S. to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed C.W.S. and J.S. with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In the Interest of J.O.A.*, 283 S.W.3d at 345; *In the Interest of J.F.C.*, 96 S.W.3d at 266; *In the Interest of J.S.*, 584 S.W.3d at 635; *Interest of M.L.L.*, 573 S.W.3d at 363; *In the Interest of M.R.J.M.*, 280 S.W.3d at 502; *In the Interest of J.T.G.*, 121 S.W.3d at 125.

Regarding the best-interest inquiry, we consider a non-exhaustive list of factors: (1) the desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of

24

the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code Ann. § 263.307(b). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in a child's best interest. *In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *In the Interest of N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

"A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In the Interest of M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (citation omitted). Evidence of a parent's continued drug use supports a finding that he poses a present and future risk of physical or emotional danger to the child and that termination would be in the child's best interest. *See In the Interest of S.N.*, 272 S.W.3d 45, 53–54 (Tex. App.—Waco 2008, no pet.).

With respect to the best interest of the children, the trial court heard evidence that Father (1) failed to demonstrate the usage of the skills learned in the parenting course and the ability to address the issues that led to removal, (2) never acknowledged any deficits in his parenting or benefited from counseling, (3) failed

25

to complete his services in his family service plan, (4) failed to maintain financial stability and stable housing, (5) was dismissive of C.W.S.'s medical diagnosis, (6) had been unable to identify that C.WS. had any development delay despite being obvious, (7) failed to demonstrate he could care for the children and be the protective parent and adequately supervise Mother, and that (8) the children were stable in their current placement which is willing to provide a forever home.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a). As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the trial court could reasonably conclude that termination of Father's parental rights is in the best interest of C.W.S. *See id*. § 161.001(b)(2), 263.307(a); *see also In the Interest of J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72; *In the Interest of S.N.*, 272 S.W.3d at 53–54; *In the Interest of M.R.*, 243 S.W.3d at 821.

We conclude that the Department established, by clear and convincing evidence, that Father committed the predicate acts enumerated in sections 161.001(b)(1)(D) and (E) and that termination of Father's parental rights is in the best interest of C.W.S and J.S. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at *1. Accordingly, we overrule issues one, two, and four. Having concluded that the evidence was legally and

factually sufficient to support the trial court's findings as to subsections 161.001(b)(1)(D), (E), and (2), we need not reach issues three, in which Father challenges the sufficiency of the evidence supporting the trial court's finding under section 161.001(b)(1)(O). *See In the Interest of N.G.*, 577 S.W.3d at 235; *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at *1; *see also* Tex. R. App. P. 47.1. We affirm the trial court's judgment terminating Father's parental rights to C.W.S. and J.S.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 22, 2022
Opinion Delivered July 28, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.